SUSAN CRAWFORD *vs.* CHRISTINA RUSSELL.

A complaint set forth, in substance, that in the year 1846, the parties entered
into an agreement in writing, under their hands and seals, by which the
plaintiff agreed that she should do all she could to aid a marriage be-
tween one R. and the defendant, by her influence and services, and in con-
sideration thereof the defendant faithfully promised and agreed with the
plaintiff that in case she became the wife of R. and outlived him, to pay
the plaintiff, for her services in the matter, $2000 in cash, and to purchase
for the plaintiff a piano forte and a gold watch for her (the plaintiff's) eldest
daughter, K., and to pay the expense of her education, to the plaintiff. The
complaint alleged that at the making of the arrangement, R. was a widower,
possessing great wealth, to the value of several hundred thousand dollars.
That the plaintiff did, at the request of the defendant, so aid the latter, fur-
nished rooms, fire and light, for R. and the defendant to meet, from to time,
and did various services for the defendant, and gave her care, skill, diligence
and attention, in aid of said marriage, at great loss and expense, and per-
formed her part of the agreement, so that on or about the 30th day of Oc-
tober, 1847, R. and the defendant were lawfully married, and from that time
lived together in great prosperity and very happily, until September 30,
1867, when R. died, leaving the defendant, as his widow, for her share, a
large estate, amounting to $50,000. The complaint then alleged a refusal
of the defendant, on request, to perform her part of the agreement, and de-
manded judgment for the payment of the consideration specified in the
agreement.

*Held*, 1. That the case partook somewhat of the character of a *post obit* agree-
ment, in that it was for services, care, diligence and attention rendered, and
expenses incurred by the plaintiff, to be paid for by a considerable sum of
money at the death of R. That viewed as such, the contract was not un-
reasonable. That if that were the only feature of the case, the judge would
have erred in nonsuiting; the reasonableness of the agreement being a
question for the jury.

2. But that the plaintiff was properly nonsuited, on the ground that the agree-
ment was a *marriage brokage* contract, and therefore void, as being against
public policy.

3. That the agreement being void, as against public policy, the claim for ad-
vances of money, and services performed, must fall with the agreement itself.

THIS is a motion for a new trial, made by the plaintiff
on a bill of exceptions, for a nonsuit of the plaintiff
at the Ulster circuit.

The plaintiff claimed the right to recover of the de-
fendant the sum of $2000 and interest, the value of a.

Crawford *v.* Russell.

piano forte and of a gold watch, and the expense of the education of the plaintiff's eldest daughter, Kate, upon an agreement entered into by the plaintiff and defendant in the year 1846, under their hands and seals, which subtantially reads as follows : " That the plaintiff should do all she could to aid a marriage between said Jeremiah and said Christina, by her influence and services, and in consideration thereof the said defendant faithfully promised and agreed, with the plaintiff, in case she became the wife of the said Jeremiah Russell and outlived him, to pay said plaintiff for her services in this matter, two thousand dollars in cash, and to purchase for the plaintiff a piano forte and a gold watch for her (plaintiff's) eldest daughter 'Kate,' and to pay the expense of her education to the plaintiff."

The plaintiff claimed and alleged that the said Jeremiah Russell, then living at Saugerties, in Ulster county, was a widower, possessing great wealth, to the value of several hundred thousand dollars. That she, the plaintiff, did, at the request of the defendant, so aid the defendant, furnished rooms, fire and light, for said Jeremiah and the said Christina to meet from time to time, and did various services for said defendant, and gave her care, skill, diligence and attention in aid of said marriage, at great loss and expense, and performed her part of said contract so that afterwards, and on or about the 30th day of October, 1847, the said Jeremiah Russell and the said Christina Crawford were lawfully married, and from that time lived together in great prosperity, and very pleasantly and happily for many years, and until the 30th day of September, 1867, when the said Jeremiah Russell departed this life, leaving the said defendant as his widow, for her share, a large estate amounting to about $50,000. That although the defendant had been requested, she had not performed her part of said agreement, but had hitherto refused and still did refuse and neglect to pay the plaintiff said sum.

of $2000, and to perform her other said covenants and agreements.

The action came on to be tried at the Ulster circuit. The plaintiff's counsel opened the case by stating, in substance, the allegations contained in the complaint. The plaintiff was then offered as a witness in her own behalf, and was sworn; upon which, and before any evidence was given, the counsel for the defendant stated to the court, that the opening of the plaintiff's counsel was substantially a statement of the facts set forth in the first count of the plaintiff's complaint, and did not state facts sufficient to constitute a cause of action, and asked the court to decide and determine that said first count stated facts showing a marriage brokage contract, which was void, and that said first count did not state facts constituting a cause of action; and the court so then and there decided.

The second count was made to depend upon the contract set up in the first count, and the offer was made to prove the services, care, skill, furnishing room, expenses, &c., but the court, on objection, refused to receive the proof, and nonsuited the plaintiff; to which the plaintiff excepted, and the court directed the exceptions to be heard in the first instance at general term.

*E. Whittaker,* for the plaintiff.

*J. A. Griswold,* for the defendant.

PLATT POTTER, J. We are referred to no case arising in our own courts, where the questions now before us have had adjudication. The questions are elemental, and seem to admit of but little conflict. Two legal questions of this character are presented, upon each of which the agreement set forth, is claimed to be void. First, that the agreement is *post obit* in its character, and therefore void as being against public policy; and second, that the agree-

Crawford *v.* Russell.

ment comes within the definition of brokage of marriage, and is void for the same reason.

1st. *Post obit* agreements, or bonds, are those given by a borrower of money, by which he undertakes to pay a large sum, exceeding the legal rate of interest, on or after the death of a person from whom he has expectations, in case of surviving him. This character of agreements are not always void. They are so when it is shown to the courts that the contracts are inequitable or unconscientious. When advantage has been taken of the weakness, necessity or ignorance of another, or such extraordinary disparity exists between the sum advanced and the sum to be received, as clearly appears to be contrary to good conscience, the courts will declare the agreement fraudulent and void, as being against the policy of the law. They partake generally of the nature of a *wager*, and contain no principle by which the value of the chances may be calculated, so as to enable the court to ascertain whether they are reasonable or unconscionable. But when it is apparent from the intrinsic nature and subject of the bargain itself, that it is such as no man in his senses, not under delusion, would make on the one hand, and as no honest and fair man would accept, on the other, the agreement will be declared inequitable and unconscientious. If this does not appear from the contract itself, it must be proved; and when proved, the court will still allow a recovery by the lender, and give him relief, by directing judgment for so much money as shall be equal to the principal received by the borrower, and interest. (*Boynton* v. *Hubbard*, 7 *Mass.* 119.) Such contracts are not *per se* nullities. The case at bar partakes somewhat of this character of being a *post obit* agreement, in that it was for services, care, diligence, aid and attention rendered, and expenses furnished in 1846; to be paid for by quite a large sum of money at the death of the person named. But the case is relieved from many of the odious features

of *post obit* contracts. There was no practice of fraud or surprise in the case; no destitute heir seduced from parental government; or any one hazarding his future inheritance for a present pittance, to supply temporary needs. There was no improvident heir or expectant of a future estate, spending it and ruining himself before he comes to it; nor was the contract legally usurious, by statute. By it no owner of an estate to be devised was to be imposed upon in his confidence and affection, who might be thus imposed upon, and give his estate to a stranger, when he would think he was giving it to one of his blood. It was an agreement between two persons fully competent to contract; each fully understanding their own interests; and each of mature age. There was no actual fraud or imposition practiced. The one was desiring aid, to obtain a present relation in the marriage state, with the concomitants of social position, wealth and happiness. The other willing to engage to assist this ambition, for a named consideration, large, certainly, if it was to be immediately enjoyed, but its payment was made subject to the contingency of success; of long delay; as well as the chance of survivorship. With the consideration of these hazards and contingencies upon the one side, and the expected advantages and enjoyments upon the other, the contract was not unreasonable. The contingencies all occurred, but only at the end of above nineteen years. If the case had depended upon this feature alone, I should think the judge erred in nonsuiting. The reasonableness of the contract would have been a question for the jury. The defendant succeeded in obtaining the desired marriage relations; she obtained the desired husband, with whom she lived in great prosperity and happiness for nearly twenty years, and dying he left her an estate of $50,000. This class of contracts are never to be encouraged by moral, wise or good men. They are productive of prodigality and recklessness, upon the one hand, and encour-

age overreaching and extortion on the other. Thus we generally see wealth and avarice generating one another. Such evils the spirit of the law does not favor; but yet, where neither fraud nor extortion exist upon the one side, nor weakness or extreme necessity upon the other, they are not totally condemned, as being *dolus malus*, but must be proved so. With the question of gratitude or ingratitude of the defendant, in her refusal to pay and perform her contract, we have nothing now to do.

But the learned judge placed his decision to nonsuit upon the other feature of the case, that the agreement in question was a *marriage brokage* contract, and therefore void.

2d. This being a novel case in our courts, it becomes our duty to examine it with regard to that question. We have said that the case depends upon elementary law. In this respect the civil law and the common law of England are found to differ. The writers upon jurisprudence in this country have generally followed the modern common law of England.

The civil law, as drawn from the code of Justinian, allowed contracts of this kind to be made by proxy; by marriage brokers, match makers, called *proxenetœ*, who were allowed to receive rewards for their services, like other brokers, to a certain limited extent. (*Code Just., lib.* 5, *tit.* 1, *pp.* 1, 6.) And at an early period of the history of English jurisprudence, these *proxenetœ* plied their vocation in that country, and were tolerated. (*Story's Equity Juris.* § 260.) The policy of the *civil* law seems to have been that all aid rendered in encouraging, and the establishment of marriages, was for the good of the nation, and promotive of public morality; inasmuch as it discouraged fornication, adultery and concubinage; that therefore, agencies by way of matchmakers, brokage, *proxenetœ*, were productive of good, rather than evil results. The policy of English law was, that the effect of such agencies and brokage, was the encouragement of influences of a perni-

cious tendency, by being the occasion of many unhappy marriages, the loss of moral influence of parents over the happiness, due nurture and education of children; the temptation to the exercise of an undue influence by false and seductive hopes held out to parties induced by the self interest of the brokage agents; these were regarded as so corruptive in their tendency as to receive condemnation in the law tribunals, as being totally void. The first controversy that seems to have arisen in the English courts upon the validity of this character of agreements, is the famous case of *Holland Keene* v. *Potter*, in the sixth year of the reign of William III, reported in 3 *Levins*, 412. One Thinne entered into a bond to pay Mrs. Potter £500 in three months after he should be married to Lady Ogle, a widow of great fortune and honor. A suit was brought on the bond, in chancery, and the master of the rolls held the bond to be void. The Lord Chancellor reversed this decree. The case was then taken by appeal to the house of lords, where, by a majority of that house, the decree of the chancellor was reversed; they holding that agreements of this kind were of dangerous tendency. Since that case, the English courts have, with great uniformity, held the rule as declared in the house of lords. After this, such contracts grew more and more into disrepute. And *Bacon* laid down this doctrine: "It is of such consequence that all marriages should proceed from free choice, and not from any compulsion or sinister means, that it hath been held that such interference was a matter indictable." (*Bacon's Abr. tit. Marriage and Divorce, D.*) And in the eighth year of William III, a criminal information was filed against one Thorp and others, for persuading one Edward Mitchell to marry one Cornelia Holton. (5 *Mod. R.* 221.) Judge Story says, in his work on contracts, (§ 564,) that "the law considers marriage as a moral and political duty, and all proper restrictions upon freedom of choice, and all agreements tending to impair

that mutual love and confidence upon which domestic happiness has its only sure foundation, and which are the only securities for faithfulness and morality in marriage, are stains which it will not permit to rest upon its ermine."

But it seems that the ground upon which the courts will interfere in cases of this kind, is not upon the ground or idea of damage done to the individual concerned, but upon considerations of public policy, and "hence," says the same learned judge, " every temptation to the exercise of an undue influence, or a seductive interest in procuring a marriage, should be suppressed; since there is infinite danger that it may, under the disguise of friendship, confidence, flattery or falsehood, accomplish the ruin of the hopes and fortunes of most deserving persons, especially of females." (*Eq. Jur.* § 261.) In the case of *Drury* v. *Hooke*, (1 *Vern.* 412,) Lord Chancellor King said, " that this character of agreements was a sort of kidnapping into conjugal servitude, and was in no case to be countenanced." Chief Justice Parsons, in *Boynton* v. *Hubbard*, (7 *Mass.* 112,) said : " These contracts are void, not because they are fraudulent upon either party, but are yet void because they are a fraud upon third persons, and because they are a public mischief, as they have a tendency to cause matrimony to be contracted on mistaken principles, and without the advice of friends, and they are relieved against as a general mischief, for the sake of the public."

It would hardly seem to be necessary to multiply American authorities to sustain this proposition. It is recognized by Judge Willard, in his work on *Equity Jurisprudence*, (*p.* 210.) And in England. (*Fonblanque Eq. Ch. b.* 1, § 10. 3 *P. Wms.* 76.)

The public policy of thus protecting ignorant or credulous persons from being the victims of secret contracts of this sort, is therefore clear ; and as Judge Story says, " the surprise is not that the doctrine should have been established in a refined, enlightened and Christian country, but

that its propriety should ever have been made a matter of debate." They are likened to lobby services in the legislature. (10 *Barb.* 489.) If then we are right that the doctrine is well established that such agreements are void as against public policy, all advances of money, and services performed, must fall with the agreement itself. The result is, that the learned judge was right in nonsuiting the plaintiff, and that judgment be given for the defendant, with costs.

BALCOM, J. This action was brought to recover $2000 and upwards, on a marriage brokage contract, which was void on the ground of public policy. The plaintiff was not entitled to recover, and was properly nonsuited. I not only agree to the conclusion arrived at by Brother POTTER, but I concur in his opinion in the case. He has gone over the whole case, and it is unnecessary for me to say more than that the plaintiff's motion for a new trial must be denied, with costs.

MILLER, P. J., also concurred.

New trial denied.

[THIRD DEPARTMENT, GENERAL TERM, at Albany, March 5, 1872. *Miller*, P. J., and *P. Potter* and *Balcom*, Justices.]