## DORA WENNINGER, Appellant, v. D. B. MITCHELL et al., Respondents.

### Kansas City Court of Appeals, November 15, 1909.

1. MATRIMONIAL AGENCY: Marriage Brokerage: Public Policy. A contract by one wishing to be married to pay for services in getting a husband by correspondence is against public policy and void.

2. MARRIAGE BROKERAGE: Aid in Correspondence. The fact that the correspondence and effort to marry a particular person had begun before the agreement was made to pay for aid in the effort, does not affect its invalidity.

3. MARRIAGE BROKERAGE: In Pari Delicto. The demand of public policy overcomes the objection of joint guilt and permits relief being granted against the marriage broker.

4. UNCONSCIONABLE AGREEMENT: Correspondence. An agreement to pay one half of a livery stable stock and business worth five hundred dollars, for service in writing two letters, is unconscionable.

Appeal from the Schuyler Circuit Court.—*Hon. Nat. M. Shelton,* Judge.

REVERSED AND REMANDED (*with directions*).

*Thos. L. Buford* and *Fogle & Fogle* for appellant.

Contracts, the consideration of which is the procurement of marriage, are void. Anson on Contracts, p. 247; 9 Cyc. 518; Lawson on Contracts, sec. 321; 2 Pomeroy's Eq. Juris., sec. 931; 2 Parsons on Contracts (5 Ed.), 74; 3 Addison on Contracts, sec. 1349; In re Grobe, 102 N. W. 804; Helen v. Anderson, 33 Ill. App. 506; Jangraw v. Perkins, 76 Vt. 127, 104 A. S. R. 917. The contract, though executed, will be set aside and the parties restored to their original position. Duval v. Wellman, 124 N. Y. 156; Place v. Conklin, 51 N. Y. S. 407; s. c., 54 N. Y. S. 532; 9 Cyc. 556, 557, sec. (f). These parties were not *in pari delicto.* Duval v. Wellman, 124 N. Y. 156. Where parties to a contract are *in pari delicto,* one of them shall not avail himself of the fraud in the contract to prevent the other from recovering his share of the profits, after the contract is executed, if the other can make out his case otherwise than through the medium and by the aid of the illegal transaction to which he himself was a party. Green v. Corrigan, 87 Mo. 370; Roselle v. Beckemeir, 134 Mo. 391; 9 Cyc. 556, 557, sec. (f). The rule that no *particeps criminis* can maintain an action founded on an illegal or immoral contract does not prohibit the vendor of land, where the sale is illegal and the conveyance void, from recovering the land, as he recovers it by virtue of his prior untainted legal title, against which the defendant cannot set up a title void by law. 9 Cyc. 556, 557, sec. (f). To the rule that, the courts will leave where it finds parties to illegal or immoral contracts, there are some exceptions: Where public policy requires the intervention of the court; where the parties are not *in pari delicto;* where the law which makes the agreement unlawful was intended for the special protection of the party seeking relief; where the illegal purpose has not been consummated; where the party complaining can exhibit his case without relying upon the illegal transaction. 9 Cyc. 550-557.

ELLISON, J.—Plaintiff instituted this action by filing a bill in equity praying for dissolution of a partnership with defendants and for an accounting. The case was referred to a referee who took the evidence brought forward by the parties and made his finding for the plaintiff. Exceptions were taken to his report, which the court sustained and entered a judgment for the defendants.

It appears that plaintiff was a widow and that her name was Skinner. That her husband died in 1905, and that afterwards, in the latter part of the summer or early fall of 1906, she returned to Queen City, Schuyler county, Missouri (the seat of this controversy), where she had formerly lived and went to board with defendants, who are husband and wife. Defendant D. B. Mitchell was engaged in the livery stable business in that town and shortly after plaintiff came to his house he sold her a half interest in the business and livery stock for five hundred dollars in cash.

It seems that plaintiff desired to get married again and was so anxious in that regard that she advertised for a husband in the newspapers through a matrimonial agency. In this way, one Wenninger, of Lincoln, Nebraska, learned of her and he too, wanting to get married, entered into a correspondence with plaintiff which quickly resulted in an engagement and shortly thereafter their marriage. In thus getting a husband plaintiff wittingly or unwittingly laid the foundation for the defense to this action. Defendants admit that plaintiff purchased one-half interest in the livery stable for five hundred dollars and became a partner in the business. But they claim that she said to Mrs. Mitchell before she purchased the interest in the livery stable that she would pay well if we "would assist her in getting a man." That after she purchased of them the interest in the stable "she said if we would help her get this man she would give us her interest in the barn for our service." Defendants say they carried out their

part of the agreement and that plaintiff's interest in the barn became theirs. We will examine the record to see what substance of law or fact there may be in this claim.

In the first place we find the work claimed to have been performed by defendants for plaintiff to be of such trifling nature as not to deserve serious consideration. It consisted principally. in writing two letters. The time covered by this "service" was between the middle of September and the 24th of October, for the first letter was written two or three weeks after plaintiff arrived at their house, which was the latter part of August, and the last one must have been prior to October 24th, as that was the day of the marriage. Thus, some time within the space of four or five weeks, Mrs. Mitchell wrote two letters at plaintiff's dictation. The record does not disclose how long a time this took, but the simple matter of writing two letters could not have taken long. Suffice it to say we cannot bring ourselves to believe the task was worth one-half of a livery stable for which plaintiff had just paid defendants five hundred dollars.

But defendants will say that the foregoing was not all the service they performed "in getting a man" for plaintiff. Their further claim came about in this way: It seems that Wenninger, recognizing the custom in such affairs, endeavored to seek plaintiff by going to her and having the wedding at her home. But counsel say the "Fates" interfered, and as he was on his way to the train in Lincoln, he met with an accident on a street car, the nature of which is not disclosed. However he immediately instituted an action for damages against the street railway and wrote to plaintiff the reason for his failure to appear at her home. It was then arranged by plaintiff that she would go to Lincoln and the ceremony could be performed notwithstanding the misfortune. Plaintiff invited defendants to the wedding and Mrs. Mitchell straightway accepted, or at least imme-

diately expressed a desire to go, but Mr. Mitchell gave evidence of some hestitation. He said he was "short of money." At any rate, when he was informed of a matter to be presently mentioned, he too accepted and all three started for the wedding. It is for thus attending the wedding that the additional service is made up. It is so out of the ordinary for one to charge for an acceptance of an invitation to a wedding that we find difficulty in allowing that it should be done in this instance. The record is silent as to any inconvenience to defendants. It does show that Mrs. Mitchell had never traveled much, and when we reflect on the pleasure it ordinarily must be to be favored with an invitation to a trip from a country village to a distant city to attend a wedding, and, as they said, partake of a "wedding feast," we are again loath to allow any charge in a proceeding in equity.

But this is not all to be said, on this head, in plaintiff's behalf and defendants condemnation. Plaintiff paid the expenses of Mrs. Mitchell and gave Mr. Mitchell a new bedstead. When he learned that plaintiff was to pay his wife's expenses for the trip and to give him her new bedstead, his objection softened and the hesitation noted above faded away. These considerations make it a matter of some wonder how this branch of the defense, so extraordinary in its nature, could have been set up.

Yet, notwithstanding the foregoing considerations, it must be conceded that the record discloses some evidence of an agreement on plaintiff's part, though she testified that there was not. For the reasons following it will not be necessary for us to say whether she did, in fact, promise to pay for what was not much more than imaginary service.

The defense is based on an unconscionable claim. In Ball v. Reyburn, 137 Mo. App. ——, 118 S. W. 524, we approvingly cited this definition of an unconscionable contract from Chesterfield v. Jansen, 2 Ves. Sr. 155: It

is a bargain "such as no man in his senses, and not under a delusion, would make on the one hand, and as no honest and fair man would accept on the other." In passing on the utter disproportion between the service said to have been rendered and the compensation claimed, we will add to what we said at the outset that we must keep in mind the situation of the parties and the possibility, or perhaps the better word would be the impossibility, of defendants rendering any real service The man they were to aid plaintiff in marrying was *not an acquaintance of theirs over whom they had influence; he was a total stranger to them, whom they had never seen or heard of and who had never seen or heard of them.* There is no pretence of any service, nor was there opportunity for any, save the mere writing of two letters, a common civility rarely made a matter for compensation. If plaintiff could have called upon any one running a typewriter, the service could and doubtless would have been performed for not more than a nominal sum.

But if we should have concluded that the evidence favored the defendants, it would have been, for another reason, of no benefit to them. It would but show a contract which the law would not aid in enforcing. The contract would be nothing less than that known as marriage brokerage, which is condemned where the English common law is enforced. The contract, according to the evidence in behalf of the defendants themselves, is one whereby they agreed to aid the plaintiff in bringing about a marriage. They were to procure, or aid in procuring, a husband for the plaintiff. It was subject to all the vicious tendencies such contracts have been shown to possess, and is wholly void. [2 Parsons on Contracts, 73; Lawson on Contracts, sec. 321; 3 Addison on Contracts, sec. 1349; Jangraw v. Perkins, 76 Vt. 127; Duvall v. Wellman, 124 N. Y. 156.]

The fact that plaintiff was engaged in seeking to marry Wenninger when defendants were called in and

employed to aid her in the already conceived purpose, does not change the nature or character of the contract, nor relieve it of any of the obnoxious features of an ordinary marriage brokerage agreement. Thus, in Jangraw v. Perkins, *supra*, the contract was to hasten an intended marriage. It read "I owe you five hundred dollars and I deed you this land to secure the debt; but if Rivett shall marry your daughter at once and be for six years her faithful husband, the debt shall be satisfied; otherwise, I must pay you five hundred dollars to be held by you in trust for her." It was condemned as illegal.

In Crawford v. Russell, 62 Barb. 92, the contract was "that plaintiff should do all she could to aid a marriage between Jeremiah and Christina by her influence and services," for which service and influence Christina promised, if she became the wife of Jeremiah, she would pay plaintiff two thousand dollars in cash and to purchase for her a piano and also a gold watch for plaintiff's daughter and pay the expense of the daughter's education. The contract was condemned as illegal. In that case it is shown that the civil law allowing and encouraged marriage brokers and match-makers for the reason that it was thought to facilitate matrimony. But the common law looked more to bad tendency and the evil consequences flowing from marriages thus brought about. And Judge STORY said "the surprise is not that the doctrine should have been established in a refined, enlightened and Christian country, but that its propriety should ever have been a matter of debate." In Boynton v. Hubbard, 7 Mass. 112, such contracts were pronounced void, "not because they are fraudulent upon either party, but because they are a fraud upon third persons, and because they are a public mischief, as they have a tendency to cause matrimony to be contracted on mistaken principles . . . and they are relieved against for the sake of the public."

The idea conveyed by these cases is that to uphold contracts of this nature would make marriage a matter of traffic, and would stimulate marriage procurement in such degree as to be demoralizing in its tendency and unhappy in its results. They are therefore condemned on the ground of public policy.

But it may be said that plaintiff is *in pari delicto* and therefore cannot take advantage of the illegality, since the law will not aid one who has joined in acts which the law forbids. There are, however, cases where notwithstanding the plaintiff may profit by the relief asked, the public good requires that it be granted; especially is that true when the party seeking relief is the lesser wrongdoer. The question was recently elaborately discussed by Judge VALLIANT in Hobbs v. Boatright, 195 Mo. 693. The judge said that "The doctrine that courts will not aid a plaintiff who is *in pari delicto* with the defendant is not a rule of universal application, it is based on the principle that to give the plaintiff relief in such case would contravene public morals and impair the good of society; therefore, the rule should not be applied in a case in which to withhold the relief would to a greater extent offend public morals. To promote the good of the public is the highest aim of the courts in the application of this doctrine. Under the head of exceptions to the rule in 9 Cyc., p. 550, it is said: 'Although the parties are *in pari delicto,* yet the court may interfere and grant relief at the suit of one of them where public policy requires its intervention, even though the result may be that a benefit will be derived by a plaintiff who is in equal guilt with the defendant. But here the guilt of the parties is not considered as equal to the higher right of the public; and the guilty party to whom the relief is granted is simply the instrument by which the public is served.' A question of what is public policy in a given case is as broad as a question of what is fraud in a given case and is

addressed to the good common sense of the court." To the same effect see Funding Co. v. Heskett, 125 Mo. App. 516, 539.

The question was presented to the Court of Appeals in New York in a case of the kind before us (Duval v. Wellman, 124 N. Y. 156). The contract was between a woman seeking a husband and the proprietor of a matrimonial journal called the "New York Cupid," and it read as follows: "June 2, 1887. Due Mrs. Guion, from Mr. Wellman, fifty dollars ($50), August 15th, if at that time she is willing to give up all acquaintance with gentlemen who were introduced in any manner by H. B. Wellman. If Mrs. Guion marry the gentleman whom we introduced her to, an additional fifty dollars ($50) is due Mr. Wellman from Mrs. Guion. (Signed) H. B. WELLMAN. E. Guion."

The court ruled that the money paid on the contract could be recovered back on the ground that the woman was not the equal in guilt with the marriage promoter. And that where the contract was not *malum in se*, the law would afford relief to the more innocent party; and that two parties might "concur" in an illegal act without being deemed in all respects *in pari delicto*.

We therefore feel not restrained by the rule *in pari delicto* and, in consequence, do not consider that it in any wise stands in the way of plaintiff's right to claim her partnership share of the livery stable property.

The judgment is reversed and the cause remanded with direction to overrule objections to the referee's report and enter judgment thereon as therein indicated. All concur.