CATHERINE FEARON, Appellant, *v.* CHARLES TREANOR, Respondent.

First Department, May 29, 1936.

Joseph S. Robinson of counsel [Robinson, Hennessy & Weitzer, attorneys], for the appellant.

Robert J. Fitzsimmons, for the respondent.

Reese D. Alsop, as amicus curiæ and for ten other amici curiæ.

UNTERMYER, J. By the enactment of chapter 263 of the Laws of 1935 (Civ. Prac. Act, art. 2-A) the Legislature declared a new public policy with regard to civil actions for alienation of affections, criminal conversation, seduction and breach of promise to marry. All these are abolished as " against public policy," except that existing rights of action are preserved if suit is brought within sixty days after the enactment of the statute or within sixty days after the accrual of a right of action for the subsequent breach of a pre-existing contract to marry. All contracts and instruments executed in payment or settlement of the prohibited causes of action are void. The threat to institute or the institution of any proceeding to recover upon any of these causes of action is a felony severely punishable.

The cause of action in the present case is for the breach of a promise to marry coupled with allegations of seduction, all of which the trial court has found to have occurred after the enactment of these prohibitory laws. Therefore, if the statute is constitutional, the judgment dismissing the complaint must be affirmed.

At the outset we may dispose of certain questions not requiring extensive consideration. Thus, I think it will not be denied that the constitutionality of the statute cannot seriously be disputed, in so far as it applies to the alleged cause of action for seduction, for the reason that the woman seduced never had a cause of action against her seducer at common law (Hamilton v. Lomax, 26 Barb. 615), the seduction operating merely to enhance the damages for the breach of the promise to marry. (Wells v. Padgett, 8 Barb. 323.) By the common law she was regarded as a " consenting party " and, therefore, equally at fault. (Salchert v. Reinig, 135 Wis. 194; 115 N. W. 132; Wrynn v. Downey, 27 R. I. 454; 63 A. 401.) Nor need we concern ourselves with the more doubtful penal provisions of the statute contained in sections 61-e and 61-g of the Civil Practice Act (Wadley Southern R. Co. v. Georgia, 235 U. S. 651; Ex parte Young, 209 id. 123; Missouri Pacific R. Co. v. Tucker, 230 id. 340; Cotting v. Kansas City Stock Yards Co., 183 id. 79), prohibiting recourse to the courts, for it is manifest that these provisions are

severable from so much of the statute as abolishes the civil actions to which it applies. (*Weller* v. *New York*, 268 U. S. 319.) Limiting ourselves, therefore, strictly to the necessities of the present case, there remains only the question of the power of the Legislature, upon grounds of public policy, to abolish actions for breach of contracts to marry where the contract was made and the breach has occurred after the enactment of the statute. In my opinion that power cannot be successfully denied.

Certain of the reasons which influenced the action of the Legislature are referred to in the preamble to the statute, in which it is declared, in substance, that, on account of their inherent nature, such actions have been widely used by unscrupulous persons as instruments of extortion. That condition, of which we might almost take judicial notice, has been made possible by the degrading publicity which inevitably attends actions of this character, however unwarranted they may be, resulting, as the Legislature has found, in the exaction of payments where there existed no legal liability. It is true that in abolishing all actions of this character the Legislature abolished any rights of action in those instances where such a claim might justly have been asserted and enforced. But in establishing a general policy the Legislature was concerned with the typical rather than with the exceptional case. (*Louisville & N. R. R. Co.* v. *Barber Asphalt Co.*, 197 U. S. 430.) It is no valid objection that the statute does not do exact justice under all circumstances.

In the light of the abuses thus found to have existed, did the Legislature exceed its constitutional power in abolishing a right of action on such a claim? It cannot be denied that under a variety of circumstances the Legislature may abolish causes of action (*N. Y. Central R. R. Co.* v. *White*, 243 U. S. 188; *Mountain Timber Co.* v. *Washington*, Id. 219) or defenses (*Missouri Pacific R. Co.* v. *Mackey*, 127 id. 205; *Minneapolis & St. Louis R. Co.* v. *Herrick*, Id. 210; *Second Employers' Liability Cases*, 223 id. 1) previously available even though in doing so it creates an immunity or imposes a liability, which would not have existed at common law. Indeed, the great office of legislation is to correct abuses and deficiencies in the common law as they manifest themselves and to adapt it to the changes of time and circumstances. (State Const. art. I, § 16; *Munn* v. *Illinois*, 94 U. S. 113.) The test in such cases, and the test to be applied here, is whether the invasion of a private right is justified by some recognized public interest to be served. (*Noble State Bank* v. *Haskell*, 219 U. S. 104; *Village of Euclid* v. *Ambler Realty Co.*, 272 id. 365.) In the present case the abuses depicted by the Legislature and commonly known to have existed in con-

nection with actions for breach of promise to marry were so prevalent, so insidious and had attained such dimensions as to justify the total abolition of such actions in so far at least as future contracts were concerned.

In so deciding we do not hold that the Legislature might abolish any form of action in connection with the trial of which abuses have developed. (*Truax* v. *Corrigan*, 257 U. S. 312.) Here there were special considerations, not usually existing, due to the nature of the publicity incidental to such actions, well known to be more detrimental to a defendant than any pecuniary loss. That detriment, rather than the merit of the action, was the cause of many settlements. The evil, therefore, was of such a kind that it could not be extirpated by methods which had been attempted in other situations in the past, as, for instance, by requiring the contract to be in writing or by limiting damages to expenses actually incurred. Had that been done the source of the evil and its consequences would yet remain. There was also the circumstance, of which the Legislature was aware, that in practical operation contracts to marry had no mutuality, because juries had consistently refused to award damages in favor of the man upon such a cause of action. Altogether the situation confronting the Legislature was such as to require that it be considered with some degree of realism, and so also should we consider it.

The exercise of such a power is not a novelty in the law. It was sustained under very similar circumstances in *Silver* v. *Silver* (280 U. S. 117), where the validity of a statute of the State of Connecticut exempting owners of automobiles from liability to guests for injuries caused by negligent operation was involved. The court said that it was unnecessary to " elaborate the rule that the Constitution does not forbid the creation of new rights or the abolition of old ones recognized by the common law, to attain a permissible legislative object," and that " we cannot say that abuses originating in the multiplicity of suits growing out of the gratuitous carriage of passengers in automobiles do not present so conspicuous an example of what the Legislature may regard as an evil, as to justify legislation aimed at it, even though some abuses may not be hit." The present statute falls directly within that principle. Indeed, it is less susceptible to attack, for it is concerned with a relation voluntarily assumed by the parties, presumably with knowledge of the statute and its consequences. " The broad distinction between one's right to protection against a direct injury to one's fundamental property right by another who has no special relation to him, and one's liability to another with whom he establishes a voluntary relation under a statute is manifest upon its statement." (*Truax* v. *Corrigan*, 257 U. S. 312.)

There is yet another reason for sustaining the validity of this statute — a reason which to my mind is even more decisive though not expressly referred to in the " declaration of public policy " which constitutes section 61-a of the Civil Practice Act nor argued on this appeal. The institution of marriage, the conditions under which it may be contracted and all that pertains thereto are matters over which, from the earliest times, the Legislature has exercised the fullest measure of control. The Legislature may prescribe the conditions of marriage and divorce. In the absence of special constitutional restrictions, it may grant divorce by special act and without cause, without infringing the due process clause of the Constitution or the provision against impairment of contracts by the States. (*Maynard* v. *Hill*, 125 U. S. 190; 2 Kent Com. 97.) The interest of the State extends not only to marriage after it has been solemnized, but to the conditions under which it is contracted. This is exemplified by those decisions which have held that marriage brokerage contracts are against public policy, because " the natural consequences of such agreements would be to bring about ill-advised, and, in many instances, fraudulent marriages." (*Duval* v. *Wellman*, 124 N. Y. 156.) To the same effect, citing many authorities, is *Crawford* v. *Russell* (62 Barb. 92), where the court quoted with approval from Bacon's Abridgment (tit. Marriage and Divorce) as follows: " It is of such consequence that all marriages should proceed from free choice, and not from any compulsion or sinister means, that it hath been held that such interference was a matter indictable." For identical reasons contracts which tend to impose undue restraint upon marriage have been held to be void. (*Hogan* v. *Curtin*, 88 N. Y. 162.) I refer to these decisions, without reference to others, as illustrative of the general principle that contracts having the effect or tendency of influencing persons to marry or to abstain from marriage against their better judgment have always been regarded as detrimental to the interests of the State.

I think it was competent for the Legislature to decide that it was more conducive to the public interest to permit engagements to marry to be broken without liability than to constrain a recalcitrant party to marry under the coercion of a breach of promise suit. (See The Family [March, 1924], vol. 5, pp. 16–22, Mudget on " The Social Effect upon the Family of Forced Marriage;" also Richmond and Hall on " Marriage and the State " [1929].) The effect of the apprehension of a breach of promise suit, upon the mind of a party who has concluded that marriage is unwise or perhaps would be disastrous, is too obvious for argument. George Lawyer (in 38 Central Law Journal, 272–274) states the issue thus: " Is the fraud and force any less because the defendant is offered the alternative of compliance or the payment of heavy

damages? In either case it is the policy of stand and deliver." If then, the State has a legitimate interest in averting an unhappy marriage and a broken home, may it not protect persons, though engaged to marry, from being driven into matrimony against their will? In other words, may it not prescribe that an engagement to marry shall be a probationary and tentative arrangement which may be abrogated without liability whenever there develops incompatibility of taste or temperament, to the end that persons engaged to marry may rectify their mistakes before they become irrevocable? I conceive this to accord with the preponderant opinion of mankind, for it is safe to say that, unlike commercial contracts, only a small proportion of broken engagements result in breach of promise suits. We think the Legislature had the right to transform into law a principle of conduct so universally approved and acted on, by placing contracts to marry on a higher plane than a contract for a day's work or for the sale of merchandise. (Compare 2 Schouler on Marriage, Divorce, Separation and Domestic Relations [6th ed.], § 1274; *Wilson* v. *Riggs,* 243 App. Div. 33; affd., 267 N. Y. 570.) Were it otherwise, the anomalous result would follow that the Legislature could dissolve the marriage the moment after it was solemnized (*Maynard* v. *Hill, supra*), but could not disturb the liability of the parties to the contract from which it had proceeded.

Eminent authorities on the law of domestic relations also have expressed the view that actions for breach of promise to marry are of doubtful public policy as tending to constrain one of the parties to adhere to an engagement when it might better be broken off (2 Schouler on Marriage, Divorce, Separation and Domestic Relations [6th ed.], §§ 1301, 1302; 1 Vernier American Family Laws, § 6; Harter F. Wright in 10 Va. Law Rev. 361–383.) The same conclusion is indicated by N. P. Feinsinger in an article on this subject in the Michigan Law Review for May, 1935 (pp. 980, 981). For these reasons, among others, some nations have never sanctioned actions for breach of promise to marry, while others strictly limit the damages to actual expenditures incurred. (Action for Breach of Marriage Promise by Harter F. Wright, 10 Va. Law Rev. 361–383; French Law of Breach of Promise of Marriage by O. E. Bodington, 6 Jour. Comp. Leg. [3d Ser.] 143, 144.) Even in this State the action is not regarded as an ordinary action for a breach of contract (*Wade* v. *Kalbfleisch,* 58 N. Y. 282), but rather as an action for injury to the person, in which punitive damages can be recovered (*Thorn* v. *Knapp,* 42 N. Y. 474) or facts in mitigation shown (*Johnson* v. *Jenkins,* 24 N. Y. 252). It is likewise excluded from the operation of the Statute of Frauds applicable to commercial contracts not to be performed within a year (Pers. Prop. Law, § 31, subd. 3; *Nearing* v. *Van Fleet,* 151

N. Y. 643.) And see the exhaustive discussion of the nature of such actions and their origin in *Lewis* v. *Tapman* (90 Md. 294; 45 A. 459). All these circumstances are convincing proof that by the common consent of mankind contracts to marry have always been regarded otherwise than commercial contracts, the enforcement of which, we may assume, could not be abrogated by the Legislature. (*Allgeyer* v. *Louisiana*, 165 U. S. 578; *Adair* v. *United States*, 208 id. 161; *Coppage* v. *Kansas*, 236 id. 1; *Adkins* v. *Children's Hospital*, 261 id. 525; *MacMullen* v. *City of Middletown*, 112 App. Div. 81; *Williams* v. *Village of Port Chester*, 72 id. 505.)

No doubt it will be answered that these dangers exist only in rare instances. But here we are concerned only with those rare instances where contracts to marry do not result in marriage on account of the unwillingness of one of the parties. In all such cases the dangers to which I have adverted will exist, and it is only to such that the statute applies.

I do not maintain that diversity of opinion may not exist as to the policy which this statute represents. That is no concern of ours. It is sufficient if the statute proceeds upon any rational conception of public policy, upon a subject which is within legislative control. The scope of our inquiry in such a case was early defined by the United States Supreme Court in *Munn* v. *Illinois* (*supra*), where Chief Justice WAITE said: " For us the question is one of power, not of expediency. If no state of circumstances could exist to justify such a statute, then we may declare this one void, because in excess of the legislative power of the State. But if it could we must presume it did. Of the propriety of legislative interference within the scope of legislative power, the Legislature is the exclusive judge." Tested by that principle, I think the Legislature had the power to enact this statute, to the extent at least that it is under consideration here. If it had that power, then the parties must be presumed to have contracted with knowledge that either could retreat at will. " One whose rights, such as they are, are subject to State restriction, cannot remove them from the power of the State by making a contract about them. The contract will carry with it the infirmity of the subject-matter." (*Hudson County Water Co.* v. *McCarter*, 209 U. S. 349; *Union Dry Goods Co.* v. *Georgia Public Service Corporation*, 248 id. 372; *Denny* v. *Bennett*, 128 id. 489.)

The judgment should be affirmed, with costs.

McAvoy and O'MALLEY, JJ., concur; MARTIN, P. J., dissents; DORE, J., concurs in result.

Judgment affirmed, with costs.