Sidney H. Asch, J.
This special proceeding is brought by the Attorney-General on behalf of the State of New York pursuant to subdivision 12 of section 63 of the Executive Law, against the proprietress of a business which matches men and women for social purposes for a fee. The State seeks to enjoin the respondent from persistently violating section 394-c of the General Business Law; to direct her to make restitution to consumers who paid more than the statutory maximum and to eliminate from the contract a marriage brokerage fee provision. Respondent has moved for an order dismissing the petition herein as a matter of law on the ground that section 394-c of the General Business Law, which furnishes the basis for the petition, is not applicable to her.
*725 The facts show that respondent introduces men and women to each other for social purposes. The petition asserts that respondent complies with none of the mandatory provisions of section 394-c of the General Business Law, enacted in 1971 and captioned "Limitations on certain contracts involving social referral services.” This section sets a limit of $250 on such contracts and protects consumers in various other ways. Respondent charges up to $500 to a consumer. Furthermore, her contract lacks certain requisite provisions. The petition seeks to prevent respondent from doing business as a social referral service unless and until she complies with the General Business Law and to direct her to make restitution to consumers who paid more than $250, the maximum permitted by the law.
Respondent has not controverted any of the essential facts alleged by the petition. She merely asserts that her business matches people for the purpose of marriage and that section 394-c of the General Business Law applies to social referral services and not to her.
The petition further alleges that respondent has a provision in her contract mandating an additional payment of up to $300 for arranging a marriage.
Section 394-c of the General Business Law defines social referral service as "any service for a fee providing matching of members of the opposite sex, by use of computer or any other means, for the purpose of dating and general social contact.” By choosing the term "general social contact” the Legislature was using the most all-encompassing term and evidencing its intention to bring a broad area of business conduct within the statutory prohibition.
As pointed out in respondent’s memorandum of law, this petition presents a question of first impression. However, in Weil v Arthur Murray, Inc. (67 Misc 2d 417), this section was held to apply to a dancing school. The court indicated that the statute was intended to have wide latitude.
Matching people for the purpose of marriage is clearly within the area covered by the statute. Literally, marriage is a "general social purpose.” Moreover, practically speaking, there is no reason why a marriage referral service should be distinguished from other social referral services. Should a marriage service be enabled to charge $500 or to make contracts for four years or not to specify a certain number of referrals or to retain personal information after the expiration *726 of a contract, while other social referral services cannot do these things? There is no significant difference, insofar as concerns the application of this statute, between a service which introduces people for the purpose of marriage, and those that introduce people for other social purposes, such as dating or dancing. They all would be covered by the law.
Attached to the papers submitted by respondent is what purports to be a letter from a member of the New York State Assembly which does not answer the question here presented. In any event, such statements from individual legislators have little weight as evidencing legislative intent. (McCaffrey, Statutory Construction [1953], § 35.)
The Attorney-General, in his memorandum in support of the bill, stated:
"The Bureau of Consumer Frauds has received an alarming number of consumer complaints regarding social matching services. Many such services charge as much as $600 for their services. Investigation indicates that this business is fraught with fraud and misrepresentation. Many companies have opened and closed due to financial difficulties or otherwise after receiving large sums of money from the public. As to companies still in operation consumer complaints fall into general classes: (1) no matches received at all; (2) matches received are totally incompatible.
"The companies in the course of their operation acquire a large amount of personal information concerning their clients. The potential for blackmail or other misuse is omnipresent. 1971 New York State Legislative Annual 96.”
The conclusion is inescapable that in defining the evil sought to be remedied, there can be no distinction whatsoever between an agency that matches people for "dating” and one that matches people for "marriage.”
Marriage brokerage contracts have been held void as against public policy in New York. (Crawford v Russell, 62 Barb 92; Duval v Wellman, 124 NY 156; Place v Conklin, 34 App Div 191; Leib v Dobriner, 60 Misc 66; Fearon v Treanor, 248 App Div 225.)
In fact marriage brokerage contracts are widely recognized as void and have been so held in all jurisdictions where they have been tested. (See annotation regarding marriage brokerage contracts, 72 ALR 1113.) Many States have pronounced such contracts void. (See White v Equitable Nuptial Benefit Union, 76 Ala 251; Morrison v Rogers, 115 Cal 252; Hellen v
*727 Anderson, 83 Ill App 506; Matter of Grobe, 127 Iowa 121; Johnson v Hunt, 81 Ky 321; Wenninger v Mitchell, 122 SW 1130 [Mo]; Overman v Clemmons, 19 NC 178; Braum v Potter Title & Trust Co., 301 Pa 365, Ann 72 ALR 1109; Anderson v Goins, 187 SW2d 415 [Tex]; Jangraw v Perkins, 76 Vt 127; and Holz v Hanson, 115 Wis 236.)
In Duval v Wellman (124 NY 156, supra), the plaintiff, in her search of a husband, had sought the aid of the defendant, the proprietor of a matrimonial bureau in New York City. A contract was signed wherein the defendant agreed to procure a husband for the plaintiff and the plaintiff paid the defendant a fee. She subsequently attempted to get her money back from the marriage broker. The Court of Appeals held the business of promoting marriages to be against the policy of the law and the public interest and concluded that the courts should aid a party who has patronized such a business by relieving him or her from all contracts made and should grant restitution of any money paid. The court considered the client of a marriage broker to be under a kind of duress or undue influence and concluded that, the natural tendency of such a business being immoral, it is the clear policy of the law to suppress it. The other cases, both earlier and later, gave similar rationales for holding marriage brokerage contracts void.
Accordingly, the respondent’s motion to dismiss the petition is denied.
The relief requested in the petition is granted.