JOSEPH URENECK *vs.* PING CUI.

No. 02-P-623.

Norfolk. September 9, 2003. - November 4, 2003.

Present: GREENBERG, KAFKER, & COHEN, JJ.

*Marriage. Contract,* With broker, Validity.

This court concluded that a marriage brokerage contract is invalid as against
public policy. [811-815]

CIVIL ACTION commenced in the Quincy Division of the District
Court Department on November 16, 1999.

The case was heard by *Paul E. Ryan,* J., on a statement of
agreed facts.

*Joseph Ureneck,* pro se.

*John P. Connell* for the defendant.

KAFKER, J. The question presented is whether an international
matchmaking services agreement providing for the payment of
$7,500 following the marriage of the defendant, Ping Cui, to a
person introduced to her by Rainbow International Marriage
Service Incorporated (Rainbow), is enforceable.[1] We conclude
that the agreement is a marriage brokerage contract void and
unenforceable as a matter of public policy.

This breach of contract action was presented to the District
Court "as a case stated," based on the following undisputed
facts: Rainbow, a Massachusetts company directed and operated
by the plaintiff, Joseph Ureneck, out of the Beijing Friendship
Hotel in China, prepared an agreement in English and Chinese
to provide "an international matchmaking service." Rainbow
agreed to "introduce suitable prospective marriage partners on a

---

[1]Rainbow was the original plaintiff in District Court. After the Appellate
Division of the District Court decided this case, an unopposed motion to
substitute Joseph Ureneck as plaintiff was allowed.

continuing basis until such time as the client is married." The service was marketed as "a personal and convenient way to meet your marriage partner." The clients were described as "Chinese and Western men and women of all ages." The clients, or at least those appearing on Rainbow's website, were in fact almost exclusively women from China. The service included putting pictures of the clients and other information they provided about themselves on Rainbow's website. In return, the clients were given the names of those who expressed an interest, as well as other information that those people, who appear to be mostly "Western" men, sent by electronic mail (e-mail) to Rainbow. Rainbow also agreed to facilitate communications between the clients and those interested in them.

The clients agreed to pay Rainbow a nonrefundable registration fee of 5,800 yuan (U.S. $700). The agreement also provided that the client "agrees to pay Rainbow US $7,500 . . . following his/her marriage with a person introduced by Rainbow, that if such payment is not made within 60 days following such marriage there shall be an annual interest rate of 18% paid by client on all payments overdue." The agreement further states that "settlement of any disputes regarding this agreement shall be settled in that country in which (1) [the] client holds legal residency and in which [the] client's spouse hold nationality or in that country in which [the] client's spouse holds nationality."

On May 20, 1995, Ping Cui signed the agreement and paid the registration fee. Ping Cui was thereafter listed and profiled on the website. Her age and employment were provided, as was her picture.

On November 28, 1997, John Choma responded to Rainbow's website expressing interest in Ping Cui. He also included personal information about himself, such as his residence in Massachusetts, his age, height, education, and that his work was in "clothing material design." Rainbow relayed all of this information, without verification or other background checks, to Ping Cui on December 13, 1997. Between December 13, 1997, and May 18, 1998, Ping Cui and Rainbow had no further communications.

In March and April, 1998, Choma sent e-mail to Rainbow, describing his ongoing correspondence with Ping Cui, his inten-

tion to meet her and her family in China, and her arrangements for wedding photographs. He also asked Rainbow for "information and procedures . . . required for marriage registration" in China. On May 18, 1998, Ping Cui wrote a letter to Rainbow that stated: "I want to first tell you that I didn't marry any person you introduced to me. The information you gave me about the man you introduced was not the same. He is not an engineer and he doesn't have a regular job. . . . From Sept. 1997 I lost my job and so don't have a regular job income. If you continue to give me service and if someone will marry me, I will not be able to pay your service fee. . . . I want us to stop our contract. I suggest you return my photos and information. Please do as I require."

Approximately one year later, on April 24, 1999, Ping Cui and Choma were married in Attleboro. The marriage certificate indicated that she was 37 years old and he was 49.

Ping Cui did not make the $7,500 payment required by the agreement "following marriage." Rainbow thereafter brought a breach of contract action in District Court in Massachusetts based on Massachusetts law.[2] The trial judge concluded that Ping Cui had received the full benefit of the bargain. He reasoned that "[w]hile this Court has no doubt that contracts which are by design intended to produce fraudulent marriages or produce mistaken marriages violate public policy, here, this is not the case." In a carefully researched opinion, the Appellate Division of the District Court reversed, concluding that the contract at issue violated the longstanding common law prohibition against the enforcement of marriage brokerage contracts.

*Discussion.* Although there are no Massachusetts cases that directly decide the validity of a marriage brokerage contract, there is clear and consistent case law and commentary to turn to for guidance. Marriage brokerage contracts are defined as contracts to pay a third person for negotiating, procuring or bringing about a marriage. See, e.g., Restatement (First) of Contracts § 582 (1932); Pollock, Principles of Contract at Law and in Equity 464 (3d ed. 1906); 2 Pomeroy, Equity Jurispru-

---

[2] The case has been presented by both parties as being governed by Massachusetts law. The plaintiff and the defendant also both reside in Massachusetts.

dence § 931, at 1952 (4th ed. 1918); 52 Am. Jur. 2d Marriage § 120 (2000).

Such contracts have been condemned and declared unenforceable in American jurisprudence without exception or equivocation. See *Morrison* v. *Rogers*, 115 Cal. 252, 253 (1896); *Hellen* v. *Anderson*, 83 Ill. App. 506, 509 (1899); *Muflahi* v. *Musaad*, 205 Mich. App. 352, 353 (1994); *Duval* v. *Wellman*, 124 N.Y. 156, 160 (1891); *Singh* v. *Singh*, 81 Ohio App. 3d 376, 381 (1992); *Anderson* v. *Goins*, 187 S.W.2d 415, 417 (Tex. App. 1945); Restatement (First) of Contracts, *supra*; 15 Corbin, Contracts § 1475, at 546 (interim ed. 2002) (courts have declared that "[t]he business of a marriage broker is illegal"). In Massachusetts, although there are no decisions ruling on the question, the Supreme Judicial Court nonetheless has referred in dicta to marriage brokerage contracts as belonging in the category of contracts void as against public policy.[3]

The rationale and rule are encapsulated in the words of Justice Story: "The pernicious tendency of such contracts is so great that enforcement of them by the courts will be refused regardless of the propriety or expediency of the particular marriage." 1 Story, Commentaries on Equity Jurisprudence § 375, at 353 (14th ed. 1918). See *Boynton* v. *Hubbard*, 7 Mass. 112, 118 (1810) (marriage brokerage contracts, although "not fraudulent on either party, are yet void, because they are a . . . public mischief, as they have a tendency to cause matrimony to be contracted on mistaken principles"). Despite inevitable changes in societal mores and the marriage brokerage business since Story wrote his treatise, there remains ample basis for concern regarding "pernicious" tendencies in the twenty-first century world of international matchmaking and marriage brokerage contracts out of which this case arises. These concerns have only been heightened as this business booms over the Internet.

---

[3]See *Boynton* v. *Hubbard*, 7 Mass. 112, 117-118 (1810) (in a case involving the question of whether an heir could contract away his expected inheritance, Chief Justice Parsons, writing for the court, analogized these contracts to marriage brokerage contracts, which he described as void); *Fuller* v. *Dame*, 18 Pick. 472, 482 (1836) (for illustrative purposes, in the context of determining the validity of a promissory note intended to influence the location of a railroad depot, Chief Justice Shaw asserted that "any promise of reward" in consideration of marriage brokerage is "void").

See, e.g., International Matchmaking Organizations: A Report to Congress (Report)[4] (although calling for more study, Report recognizes that a virtually "unregulated international matchmaking industry presents numerous opportunities for exploitation"). See also Chun, The Mail-Order Bride Industry: The Perpetuation of Transnational Economic Inequalities and Stereotypes, 17 U. Pa. J. Intl. Econ. L. 1155, 1183-1187 (1996) (identifying potential problems faced by Internet mail-order brides); Jackson, To Honor and Obey: Trafficking in "Mail-order Brides," 70 Geo. Wash. L. Rev. 475, 476-480 (2002) (describing deception and exploitation associated with international matchmaking organizations in the Internet age); Lee, Mail Fantasy: Global Sexual Exploitation in the Mail-Order Bride Industry and Proposed Legal Solutions, 5 Asian L.J. 139, 141 (1998) (focusing on the problems arising from the "organized business of capitalizing on women's disadvantaged positions in pursuit of profit" from marriage); Lloyd, Wives for Sale: The Modern International Mail-Order Bride Industry, 20 Nw. J. Intl. L. & Bus. 341, 353-354 (2000) (identifying particular vulnerabilities of the immigrant, Internet-ordered bride and commenting on problems potentially arising out of the marriage brokerage debt).

The undisputed facts here establish that the agreement at issue is a marriage brokerage contract. The company, whose full name was Rainbow International Marriage Service, agreed "[t]o introduce suitable prospective marriage partners on a continuing basis until such time as the client is married." As previously noted, the services were advertised as "a personal and convenient way to meet your marriage partner." With the exception of the $700 up-front, nonreimbursable fee, the remainder of the compensation Rainbow would receive was due only upon

[4]The Report, available on the Bureau of Citizenship and Immigration Services website, at http://www.bcis.gov/graphics/aboutus/repsstudies/ Mobrept__full.pdf (last visited November 3, 2003), was issued in response to the Congressional mandate made under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. 8 U.S.C. § 1375(d) (1996) (Act). The Act, aimed at immigration fraud, requires that international matchmaking organizations (IMOs) provide immigration and naturalization information and the Report to noncitizens using the IMOs' services and imposes civil penalties for failure to provide such information. 8 U.S.C. § 1375(b)(1), (2).

the client's marriage. The amount due upon marriage was more than ten times the amount of the registration fee.[5]

The plaintiff argues that the agreement is not a marriage brokerage contract because his business is providing other services and he is not being paid for the marriage, just the services leading up to the marriage, should the marriage occur. His argument ignores the letter and spirit of the contract, which is tightly focused on procuring and paying for marriage. His agreement, or at least the $7,500 marriage payment provision at issue, is also not a dating services and support contract, as he contends. The agreement does not even refer to dating or social referral services. Dating or social referral services contracts that do not contain provisions for payment based on marriage are not marriage brokerage contracts. Cf. *State* v. *Leifer*, 89 Misc. 2d 724, 725-726 (N.Y. Sup. Ct. 1976) (interpreting N.Y. Gen. Bus. Law § 349-c [McKinney 1988] and granting Attorney General's request to eliminate marriage brokerage fee provision from "social referral services" contract on public policy grounds).

The plaintiff also seeks to define narrowly what makes a marriage brokerage contract void as a matter of public policy. He suggests that only contracts to procure a marriage with an identified person or agreements to bring about marriages for improper reasons are prohibited. He also argues that because he is paid only "following" the marriage, he is not interfering with the spouse's free choice of partner. This ignores the breadth of the prohibition as defined by the common law, which, as stated earlier, is concerned with the "pernicious" tendencies of these contracts in general and does not draw distinctions based on the different types of marriage being brokered, the motives of the marriage partners or broker, the situation of the spouses, or the propriety of the particular marriage.[6] We conclude that this

---

[5]The defendant has not counterclaimed for the return of the $700. Only the $7,500 marriage payment is in dispute.

[6]See *Fuller* v. *Dame*, 18 Pick. at 481 (brokerage contract still void even if a "man might entertain a very sincere opinion, that a marriage between a certain gentleman of his acquaintance, and a lady of considerable fortune, would be highly beneficial and contribute to the happiness of both parties"); 2 Pomeroy, Equity Jurisprudence § 931, at 1952 (marriage brokerage contracts

agreement falls squarely within the categorical prohibition against marriage brokerage contracts and is therefore void as against public policy.

> *Decision of the Appellate Division of the District Court affirmed.*

---

are "absolutely void, without the slightest regard to the situation of the spouses or the fitness of the marriage"); 1 Story, Commentaries on Equity Jurisprudence § 375, at 353.