**In the Matter of FIRST UNITED PARTNERS 9, Debtor.**

**FIRST UNITED PARTNERS 9, Plaintiff,**

v.

**WILLIAMS MEAT COMPANY, Defendant.**

**Bankruptcy No. 85–01301–3–11.**
**Adv. No. 85–0677–3–11.**

United States Bankruptcy Court,
W.D. Missouri, W.D.

Jan. 30, 1986.

Arthur B. Federman, Gary D. Barnes, Kansas City, Mo., Linde, Thomson, Fairchild, Langworthy, Kohn & Van Dyke, P.C., for plaintiff.

Gordon N. Myerson, Kansas City, Mo., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND FINAL DECREE AND JUDGMENT DECLARING SALE AGREEMENT VOID AND DIRECTING TURNOVER OF RENTAL PAYMENTS UNDER INITIAL LEASE

DENNIS J. STEWART, Bankruptcy Judge.

Now before the court are a complex of issues which have been transferred to the undersigned from the division of the bankruptcy court formerly presided over by the Honorable Joel Pelofsky. All of these issues focus around one central issue—that of whether a lease agreement, initially entered into by and between the debtor (as lessor) and the Williams Meat Company (as lessee), under which the debtor would be entitled to receive monthly payments of such magnitude that it could make sufficient adequate protection payments to the secured creditor World Savings and Loan Association, is still in force and effect. If it is still in force and effect, then the debtor would be entitled to prevail on its complaint against Williams Meat Company for the turnover of past due rents. These rents could be used to bestow adequate protection on World Savings and Loan Association. And this development, in turn, would lead to the denial of World Savings and Loan Association's pending motion for relief from the automatic stay and the pending motion of Williams Meat Company for dismissal of the within chapter 11 proceedings.[1]

The Williams Meat Company, on the other hand, claims that the lease initially entered into between it and the debtor was modified by a later agreement—an agreement purporting by its terms to lower Williams Meat Company's lease payments to an extent that World Savings and Loan Association could not be accorded adequate protection. If this latter agreement is the one which governs, the debtor corporation may not be salvageable in chapter 11 proceedings by means of debtor's collecting the rents past due and owing.[2]

A related issue, or so it appeared, was formerly tried before the distinguished Judge Pelofsky. The parties then appear to have placed before the court the issue of which of the two lease agreements was

1. In its complaint filed on November 21, 1985, to commence the adversary action, the debtor alleges that, under the lease agreement which "has been and continues to be in full force and effect since July 15, 1984," the "monthly rental for the three year lease term is ... $11,775.00;" and that "[t]he amount that should have been paid ... through the date the petition was filed [is] ... $143,028.02" plus interest and attorney's fees." Strangely, the defendant, in answering the complaint, requested that the court require certain members of the partnerships to make payments on *their* notes to the debtor. But that is an action which the defendant has no standing to maintain in the absence of special permission of the court *Dallas Cabana, Inc., v. Hyatt Corporation,* 441 F.2d 865, 868 (5th Cir.1971), ("[t]he failure of the trustee to assert a cause of action against the appellees in this case is not sufficient to authorize this court to hold that the action has been abandoned and that, therefore, this appellant has a right to maintain it. The remedy of the appellant is to petition the bankruptcy court to compel the trustee to bring suit or to authorize the bankrupt to sue or to make such disposition as appears to be appropriate in the circumstances and under the facts presented to the court.") Under the modifications of the lease agreement which defendant insists were effective from July 25, 1984, the rental payments would have been reduced to $4415.62–$8831.25 per month. The monthly adequate protection payments to the secured creditor having a security interest in the leased property, World Savings and Loan Association, would be in the vicinity of $6300.00 and are now some $18900.00 in arrears, as of the time of the hearing in this action.

2. Which otherwise would be sufficient to sustain these chapter 11 proceedings. See note 1, *supra.*

currently, since the inception of these chapter 11 proceedings, in force and effect.[3]

This general issue, however, was narrowed by Judge Pelofsky to a determination of whether the agreement embodying the amended lease constituted an executory contract which the debtor might be permitted to reject. In his order of November 1, 1985, Judge Pelofsky ruled that the agreement containing the subsequent amendments to the initial lease was in fact an executory contract and that it should be rejected. On the motion of Williams Meat Company for reconsideration, Judge Pelofsky made it clear, in his order of December 30, 1985, that he had not intended to rule on the issue of which lease was currently in effect, but only that the agreement embodying the second, or amended lease, was rejected.

The provisions of § 365(h) of the Bankruptcy Code, however, which permit a lessee to remain on the premises following rejection in accordance with the obligations imposed on it by the terms of the lease in effect made rejection of the lease a spurious issue with very little meaning. The

decision permitting rejection left the debtor only with a vapid and pyrrhic victory[4] and now causes it to repair to this division of the bankruptcy court for a decision on the substantive and determinative issues.

### Jurisdiction

But the threshhold issue which now looms before the bankruptcy court is that of jurisdiction, an issue which Williams Meat Company orally placed before the court in the course of the hearing of January 15, 1986, and which the court, furthermore, even without a motion before it, is obliged to take up *sua sponte.* See § 157(b)(3), Title 28, United States Code. As observed above, the provisions of § 365(h) make the issue of what obligations are imposed upon the lessee one of "nonbankruptcy" or state law.[5] Thus, it at once defines the action which arises on this issue as one arising under state law and makes its resolution essential to the administration of the bankruptcy estate. Insofar as its resolution is essential to the bankruptcy estate, it appears, under a long line of traditional authority, to be within bankruptcy court jurisdiction.[6]

---

3. From the review of the evidence which is now afforded, it would appear that the only real issue which is at the center of the issues in the reorganization case is which of the lease or rental agreements is valid. The issue of acceptance or rejection could settle very little, in view of the provisions of § 365(h)(1) and (2) of the Bankruptcy Code to the following effect: "[i]f the trustee rejects an unexpired lease of real property of the debtor under which the debtor is the lessor, or a timeshare interest under a timeshare plan under which the debtor is the timeshare interest seller, the lessee or timeshare interest purchaser under such lease or timeshare plan may treat such lease or timeshare plan as terminated by such rejection, where the disaffirmance by the trustee amounts to such a breach as would entitle the lessee or timeshare interest purchaser to treat such lease as terminated by virtue of its own terms, applicable nonbankruptcy law, or other agreements the lessee or timeshare interest purchaser has made with other parties; or, in the alternative, the lessee or timeshare interest purchaser may remain in possession of the leasehold or timeshare interest under any lease or timeshare plan the term of which has commenced for the balance of such term and for any renewal or extension of such term that is enforceable by such lessee or timeshare interest purchaser under

applicable nonbankruptcy law." "If such lease or timeshare interest purchaser remains in possession as provided for in paragraph (1) of this subsection, such lessee or timeshare interest purchaser may offset against the rent reserved under such lease or moneys due for such timeshare interest for the balance of the term after the date of the rejection of such lease or timeshare interest, and any such renewal or extension thereof, any damages occurring after such date caused by the nonperformance of any obligation of the debtor under such lease or timeshare plan after such date, but such lessee or timeshare interest purchaser does not have any rights against the estate on account of any damages arising after such date from such rejection, other than such offset."

4. See note 3, *supra.*

5. See note 3, *supra.*

6. See, e.g., *Diners Club, Inc., v. Bumb,* 421 F.2d 396, 398 (9th Cir.1970), to the following effect: "[u]pon the filing of the petition, all property in the possession of the debtor passed into the custody of the reorganization court, and became subject to its authority and control. In the exercise of its jurisdiction over the debtor's

The action itself, however,—one to determine whether one contract or another is in existence—arises solely and exclusively under state law. The governing bankruptcy statutes themselves foreclose any possibility that this action could be considered to arise under the bankruptcy laws.[7] The action, therefore, must, at most, be regarded as one "related to" bankruptcy proceedings within the meaning of § 157(b)(1), Title 28, United States Code, as to which the bankruptcy court is obliged to render a report and recommendation to the district court, rather than decide the action itself, in accordance with § 157(c)(1) of the same title.[8]

But, in this case, for this court to render a report and recommendation to the district court would result in the destruction of federal court jurisdiction. For the evidence, *inter alia*, clearly shows that a state court action is currently pending in which the debtor has sought, in substance, to have the subsequent lease amendments declared invalid and to eject the Williams Meat Company from the premises.[9] And, under the provisions of § 1334(c)(2), Title 28, United States Code, when a state court action is pending in a related case, the district court is required to abstain in favor of the state court action.[10] The probability of the district court's abstaining from this action, moreover, is greatly increased to around 100% by the existence of the back-up, permissive abstention statute, § 1334(c)(1), Title 28, United States Code.

Accordingly, if it is necessary for this case to be determined in the federal court system, it is the bankruptcy court which must make the decision. As observed above, historically, a bankruptcy or reorganization [11] court has been believed to be inherently empowered to make decisions without which estate administration would be "impossible." [11a]

property, the court had power to issue injunctions and all other writs necessary to protect the estate from interference, and to ensure its orderly administration."

7. None of the bankruptcy statutes concerned with recovery of property of the estate defines an action to determine amounts due under contracts when the matter is contested. Cf. *Matter of Kakolewski,* 29 B.R. 572 (Bkrtcy.W.D.Mo. 1983).

8. See, § 157(c)(1), to the following effect: "[a] bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected."

9. This fact has been established by the uncontradicted statements of the parties in the course of the hearing of January 15, 1986.

10. See, § 1334(c)(2), Title 28 U.S.C., "[n]othing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to cases under title 11."

11. Formerly, the district court was the reorganization court when *Diners Club, Inc., v. Bumb, supra* note 2, was decided. But the jurisdictional statutes contained within the Bankruptcy Amendments and Federal Judgeship Act of 1984 have not to date been interpreted to give the district court sole power in reorganization cases. Thus, they are interpreted to make the bankruptcy court the reorganization court.

11a. See *Matter of Titan Energy, Inc.,* 57 B.R. 498, 501 n. 4 (Bkrtcy.W.D.Mo.1986), to the following effect: "[i]t has been held that 'a bankruptcy court does have jurisdiction to resolve a dispute between third parties "if it is impossible to administer completely the estate of the bankrupt without determining the controversy." ... Even if resolution of the controversy might have a "chilling effect" on the financing of the arrangement plan ... or might reduce claims against the debtor's estate ... exercising jurisdiction over a collateral controversy is improper where it is "possible" to administer the estate without resolving the controversy.' *Matter of Paso Del Norte Oil Co.,* 755 F.2d 421, 425 (5th Cir.1985). It is clearly possible, for the reasons spelled out in the text of this order, to administer the estate without resolution of this controversy. And, otherwise, to require the bankruptcy court to assume jurisdiction of this matter would run the risk of requiring it to assume jurisdiction of matters arising purely under state law. It is a risk which the bankruptcy court itself should not be prepared to take, lest it be accused of attempting to arrogate Article III status to itself. '[T]he bankruptcy court must be circumscript in

Under the particular factual circumstances of the case at bar, the court can only conclude that bankruptcy administration of this case in reorganization proceedings would be "impossible," within the meaning of the foregoing authorities, unless this court exercises jurisdiction. If the bankruptcy court does not make the decision—and do it promptly—the debtor will not have at its disposal the means with which to confer timely [12] adequate protection upon the secured creditor World Savings and Loan Association and thereby avert the granting of relief from the stay and the dismissal of the reorganization proceedings. The bankruptcy process, under such circumstances, cannot await the outcome of proceedings in other courts when the debtor and its creditors face disaster in the near future [13] unless the means is quickly obtained for the granting of adequate protection, either through payment of past due rents or return of the premises to the debtor. The demands of adequate protection, immediate at the outset, are even more pressing in this case which has now been pending for a protracted period of time in another division of this court.[14] Unless decision is made quickly in this court, these reorganization proceedings will lose their identity as reorganization proceedings.

■ This court has, in all its prior decisions since the Supreme Court's handing down the decision in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), been circumspect in its decisions respecting its own jurisdiction.[15] It has done so for the reason that interpreting the current jurisdictional statutes to confer on the bankruptcy court jurisdiction to determine controversies arising under state law would, under plain constitutional precedents, confer Article III status on the bankruptcy court.[16]

In this case, however, the "rule of necessity," despite the circumspection of this court, compels this court to recognize its own necessarily constitutional power to hear such case.[17]

### FINDINGS OF FACT

■ It is necessary and proper, then, for this court to proceed to find the facts which are material to the determination of the issue of validity *vel non*. Although the evidentiary record is sparse in this regard, and the court suspects that the record previously made before the transferor judge was more ample and clear, it seems obvious

---

interpreting the law delegating powers to it lest it be accused of arrogating Article III powers to itself.... It has historically been held that the designation placed by Congress on a court as an Article III court or a non-Article III court is not controlling; the question is whether any of the federal judicial power is conferred upon the court in question.' *Matter of Richardson*, 52 B.R. 527, 533 (Bkrtcy.W.D.Mo.1985)."

**12.** See note 1, *supra.* Because this chapter 11 case has now been pending for several months, it has become necessary for the debtor promptly to confer adequate protection on the secured creditor World Savings and Loan Association. See *Matter of Embrey*, 56 B.R. 626, 628 (Bkrtcy.W.D.Mo.1986), to the following effect: "[i]t is difficult to understand how the delay in enforcement of pre-confirmation rights could be held to be adequately protected only by more delay in the form of a promise to pay in the indeterminate future—or even in the determinate future if the delay in payment is to be unreasonably long."

**13.** See notes 1 and 12, *supra.*

**14.** As time progresses, the arrearage owed to World Savings and Loan Association not only grows larger, but interest on it compounds, and the amount of adequate protection continually increases.

**15.** See *Matter of Richardson*, 52 B.R. 527, 534 (Bkrtcy.W.D.Mo.1985): " '[I]t has historically been held that the designation placed by Congress on a court as an Article III court or a non-Article III court is not controlling; the question is whether any of the federal judicial power is conferred upon the court in question ... [and] it has in the past been held that a court initially created as a non-Article III court may "mature" into an Article III court by reason of being assigned a portion of the federal judicial power.' "

**16.** See note 15, *supra.*

**17.** If a statute must necessarily be construed to confer Article III powers on a court, that court must be deemed an Article III court. *Glidden Co., v. Zdanok*, 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962)

that the provisions for rents in the initial lease were several times greater in the initial lease agreement than in the modification contained in the later agreement for sale of July 25, 1984[18]; that the later "agreement for sale" of July 25, 1984, ostensibly provided for sale of the premises at a sale price of slightly more than their current market value, but over such a period of time and at such an interest rate that, in reality and substance, much less than the market rate would be realized[19]; that the contract was entered into by a general partner of the debtor[20] at a time when its financial position was failing and when he believed that it would not be possible for the debtor entity to carry on with its business without some immediate infusion of capital which the agreement offered him; that, therefore, in order to gain this temporary infusion of capital, he signed an agreement which, nevertheless, did not even validly provide for the assumption of the debtor's obligation to World Savings and Loan Association nor did it provide for sufficient periodic payments to the debtor to meet its obligation to World Savings and Loan Association. Thus, the debtor's agent, caught in an economic squeeze where he believed that he had to attempt to gain capital and escape the obligation to World Savings and Loan Association at any cost, was moved to sign a contract which made it only more impossible either to meet or avoid the obligation to World Savings and Loan Association.[21]

## CONCLUSIONS OF LAW

■ These facts compel this court to nullify the sale agreement of July 25, 1984, as an unconscionable contract of adhesion which the debtor was compelled to sign because of "economic duress" or "business compulsion." In a similar case formerly decided by this court, *Smith v. Guaranty*

*State Bank and Trust Co.*, 15 B.R. 691 (Bkrtcy.W.D.Mo.1981), the debtors, in order to obtain capital to continue business operations, were compelled by the lender to put up collateral to guarantee the past due obligations of their corporation. As in the case at bar, the contract entered into simply entailed the forfeiture of the property rights of the debtors in return for a comparatively small amount of desperately needed capital, and the additional obligations undertaken in order to gain that comparatively small amount of capital were wholly destructive of any temporary benefit gained.[22] Under those circumstances, this court concluded as follows:

"Under such circumstances there is ample precedent for nonenforcement of the contract as a 'contract of adhesion' or an unconscionable contract. See *U.S.A. Chem, Inc., v. Lewis*, 557 S.W.2d 15, 24 (Mo.App.1977) ('[A]dhesive clauses are subject to a defense of unconscionableness only when exacted by the overreaching of a contracting party who is in an unfairly superior bargaining position.'); *J.J. Newberry Co., v. Mixon*, 440 F.Supp. 20, 21 (E.D.Mo.1977) ('An unconscionable contract is one which no man in his right senses would make on the one hand and which no fair and honest man would accept on the other.'). See also *Jump v. Manchester Data Sciences Corp.*, 424 F.Supp. 442, 444, 445 (E.D. Mo.1976), to the following effect:

'The general rule is that courts will not declare an agreement to be void simply because it is unwise. 17 Am. Jr.2d Contracts § 192 (1964). If, however, the bargain "is a bargain 'such as no man in his senses, and not under a delusion, would make on the one hand, and as no honest and fair man would accept on the other.' " a court will find the agreement to be unconscionable

---

18. See note 1, *supra.*

19. Although the rate would, on its face, be for an amount approximately equal to the current market value of the property, the terms of payment are so favorable to Williams Meat Company that purchase would be actually only for a proper fraction of its value under the July 25, 1984, modifications.

20. The power of the partner to act for the debtor under these circumstances has not been questioned.

21. See note 1, *supra.*

22. See note 1, *supra.* See also note 19, *supra.*

and refuse to enforce the same. *Wenninger v. Mitchell,* 139 Mo.App. 420, 122 S.W. 1130, 1132 (1909). See also, *Ball v. Reyburn,* 136 Mo.App. 546, 118 S.W. 524 (1909); 14 Williston on Contracts § 1632 (ed. 1972)(tests of unconscionability include the above cited rule and that "... no decent, fairminded person would view the ensuing result without being possessed of a profound sense of injustice ...") Cf., *Drake v. Greener,* 523 S.W.2d 601 (Mo.App. 1975) ("... where a person has been induced to part with a thing of value for little or no consideration, equity will seize upon the slightest circumstances of fraud, duress, or mistake for the purpose of administering justice in the particular case.").'

In this case, it is manifestly and extremely unfair, under the circumstances detailed above, for the plaintiffs to lose their home on account of an indebtedness which they never incurred, bear no legal or moral responsibility for, and when their liability for it was not made clear to them.

"And even if the facts on the material issue of whether discussion regarding guarantee of pre-existing debt was had must be decided otherwise, this contract would still be unenforceable under the doctrine of 'economic duress' for the defendant bank, by threatening not to grant the new money which was essential for continuation of business operations, would have overborne the will of the plaintiffs to do the thing they could do to obtain the money necessary to keep the corporation in business—guarantee the great magnitude of pre-existing corporate debt. See *Schoen v. Lange,* 256 S.W.2d 277, 282 (Mo.App.1953), to the following effect:

'[D]uress, ... as understood in the decisions of this state, comprehends any form of constraint or compulsion which is sufficient to overcome the will of a person of ordinary firmness and to induce him to comply with a demand to which he would not have yielded had he been permitted to act of his own volition ... In the case of fraud the party defrauded acts because of the false representation made to him, while in the case of duress he acts knowingly but unwillingly because of the compulsion exercised on him.'

See also *Wolf v. St. Louis Public Service Co.,* 357 S.W.2d 950, 954 (Mo.App.1962), where it is said that:

'Under the so-called modern equitable rule a contract obtained by so oppressing a person by threats as to deprive him of the free exercise of his will may be avoided on the ground of duress whether or not the oppression causing incompetence to contract amounts to what was formerly deemed duress at law or merely to the wrongful compulsion remediable in equity.'

And further, see *Fizzell v. Meeker,* 339 F.Supp. 624, 627, 628, (W.D.Mo.1970), quoting 25 Am.Jur.2d Duress and Undue Influence, § 6, P. 361, to the following effect:

'There is no doubt that the early common law doctrine of duress has gradually expanded and broken through its original limitations, and it is now recognized that undue influence with the conduct of a business or occupation may constitute duress. Many states have adopted the modern doctrine of "business compulsion" or what is sometimes referred to as "economic duress or compulsion." This doctrine has been regarded by some of the courts as being different from duress, and in the sense that it is a relaxation of the early common law rule this is true. Yet, broadly speaking, "business compulsion" is a species of duress, not the common law duress to be sure, but duress clothed in modern dress. It seems to be established as a general rule, at least in this country, that the payment of money or the making of a contract may be under such circumstances of business necessity or compulsion as will render the same involuntary and entitle the party so coerced to recover the money paid, or excuse him from performing the contract, especially where undue advantage or a threat to do an unlawful

injury is shown. It has also been held that an action may be brought to recover damages for "economic coercion." '

In this action, the evidence shows that the loan would not have been made except for the extraction of the unconscionable guarantee."

The facts of this case, in the material particulars, are the same as the *Smith v. Guaranty State Bank and Trust Co., supra.* Accordingly, it is hereby

ORDERED, ADJUDGED, AND DECREED that the sale agreement of July 25, 1984, be, and it is hereby, declared to be void and invalid. It is further

ORDERED AND ADJUDGED that, pursuant to § 542 of the Bankruptcy Code, the Williams Meat Company turn over the back rent owed under the initial lease agreement to the debtor with reasonable dispatch.[23]

---

**23.** There is nothing in the pleadings on evidence to contradict the debtor's contention that the amount of back lease payments due is $143,028.02. See note 1, *supra.* In its evidence and pleadings, the defendant asserts that certain "setoffs" are to be subtracted from any amount due, by reason of certain bad conditions of the premises—lack of air conditioning, principally, and constant leaking of the roof. According to the evidence which the defendant has adduced, however, does not demonstrate the complete inhabitability of the premises. Indeed, the defendant's obvious intention to stay on the premises belies any contention of inhabitability. And, otherwise, the evidence does not purport to show any value of any amounts to be subtracted from the due and past due lease payments. The court is forbidden by law in rendering a judgment based only on speculation and conjecture.